IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 3:21-cr-023-JAG-1 |
| CARLOS L. HARVEY, | |
| Defendant. | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, Raj Parekh, Acting United States Attorney for the Eastern District of Virginia, Olivia L. Norman, Assistant United States Attorney, and Shennie Patel, Trial Attorney with the U.S. Department of Justice's Environment and Natural Resources Division, hereby submits its Sentencing Memorandum.

The government has no objections or corrections to the Presentence Report ("PSR") or the calculation of the advisory guidelines range. The probation officer determined that defendant's adjusted offense level is 16. PSR ¶ 60. With 3 points deducted for timely acceptance of responsibility, defendant's total offense level is 13. PSR ¶¶ 64, 115. Defendant has 3 criminal history points, resulting in a Criminal History Category I. PSR ¶¶ 81-82, 116. Defendant's advisory sentencing guidelines range is 15 to 21 months. PSR ¶ 116.

As set forth below, the government respectfully recommends a Guidelines sentence.

### A.  RELEVANT FACTUAL BACKGROUND

Defendant pleaded guilty to conspiracy to engage in an animal fighting venture, in violation of the Animal Welfare Act, 7 U.S.C. §§ 2156(a)(1) and (b), and 18 U.S.C. § 49. ECF No. 13. In support of that plea, defendant signed a statement of facts in which he admitted he

conspired with others starting from in or before April 2013, and continuing through and including July 11, 2018, to sponsor and exhibit dogs in animal fighting ventures, as well as sell, buy, possess, train, transport, deliver, and receive dogs for the purposes of having the dogs participate in animal fighting ventures. ECF No. 14. Defendant admitted to possessing, owning, breeding, training, transporting, and fighting dogs throughout the conspiracy from February 2016 to July 2018. Defendant, aka "Los," "Los44," "roc9," or "Priest50," admitted to communicating with coconspirator OA regarding the two-card dog fight that occurred on April 3, 2016, in King George, Virginia, behind a house belonging to defendant's relative. In addition to providing the location and setting rules for the fight, such as "no open invitations" and "no walk-ins," defendant also introduced coconspirator OA to his New Jersey opponent, coconspirator MA. Defendant further admitted to meeting with others at the King George, Virginia, Walmart before the dog fight. Video surveillance evidence showed defendant meeting up with coconspirators OA, MA, and EP in the Walmart parking lot in King George, Virginia, before being led to the fight location. Defendant did not sponsor a dog at this fight, but attended the fight along with



coconspirators OA, MA, EP, and CM who fought each other's dogs in the two-card event. Two of the dogs died as a result of fighting.

On July 11, 2018, agents seized from defendant's residence eleven pit bull-type dogs maintained in conditions consistent with use in dog fighting ventures. All of the dogs, except two puppies, were isolated from each other, either in separate pens or tethered on chains that would not allow the dogs to reach each other. Veterinary assessments of the dogs indicated that most of the adult dogs had extensive, visible old and some

new scars on their faces, legs, necks, and backs, as well as puncture marks, damaged tails, and fractured teeth.



One of the dogs was missing a right eye although the cause was not determined. However, electronic evidence revealed two videos recorded on defendant's phone at his residence taken in January and April 2017 of the same dog with the missing eye (identified by distinct markings on his nose and paws) tied to a tree and at the end of a heavy chain lunging and trying to get at another dog also restrained and lunging (both dogs were restrained but could only get within about a foot of each other once they reached the end of their chains). (Screenshots taken from videos, Bates Nos. DF_CH_SW_0004994.mov and 0004999.mov).






One dog, named "Hope aka USM 207" by law enforcement, had significant scarring and past damage to her muzzle. (See Exhibit A, page 6). Although she was small and very friendly to humans, she was deemed too dog aggressive for rehabilitation. Other seized dogs were underweight with muscle-wasting. Even though friendly to humans, five of the seized dogs had to be euthanized by a veterinarian after a period of time following regular vet care, human interaction and playtime, and proper nutrition, because these



dogs were determined to be too dog aggressive to be considered for rehabilitation. One of the dogs, named "Enid" by the animal handlers, showed significant scars and puncture marks, and was so aggressive, he could not even be handled by humans without heightened precaution and was euthanized for extreme aggression. (See Exhibit A, page 6). Veterinarians assessed one of the dogs to be pregnant and she had seven puppies following seizure. At seizure, she had leg scars and was thin, but showed no signs of aggression.

Agents also seized significant dog fighting training equipment, including ten-pound weights, a flirt pole, weighing scale, weighted dog collars, dog harnesses, large-link chains, and forced breeding stands. In addition, agents seized medical first aid pet supplies, including syringes,  supplements, Dermabond (skin adhesive), wound dressing, and antibiotics. In addition, agents found fighting dog pedigree paperwork and ads showing a dog for sale with defendant's number in the advertisement.

Electronic evidence seized from defendant revealed his extensive and continuous involvement with many dog fighters not limited to just his coconspirators, in every aspect of a dog fighting venture: breeding, training, transporting, and fighting. His electronic devices contain countless videos taken by defendant of him training dogs in his backyard, using equipment including tires tied to trees, a slat-mill (a treadmill outfitted for dogs that restrains

dogs while running), heavy weighted collars, and heavy, thick chain leashes, all of which were individually observed and/or seized from his residence. Defendant's electronic devices also contain countless videos and photos, taken in his backyard, of dogs being forcibly restrained on one or the other of two exact breeding stands located at his residence. Finally, his electronic search history reveals endless searches and saved results from Facebook and the internet of fighting dog pedigrees and advertisements for fighting dogs for sale, their puppies for sale, or stud services.

After securing the fight location at his relative's house for the April 2016 dog fight and after attending the fight, defendant's involvement in dog fighting did not slow down, even after agents executed a federal search warrant on coconspirator OA's residence in June 2016 or after a court sentenced coconspirator MA in April 2018 for his involvement in the April 2016 fight. In fact, on June 20, 2016, defendant messaged another dog fighter stating that defendant had changed his number after what happened to coconspirator OA and asked the other fighter why he had not changed his number since they [law enforcement] "may have [been] on … [coconspirator OA's] line or my line." On April 19, 2018, defendant chatted with another person, sending that person a copy of a press release regarding the sentencing of New Jersey coconspirator MA. (Defendant introduced coconspirators MA and OA to each other before they fought each other's dogs in the April 3, 2016, dog fight.) Knowing that the federal government had taken down two of defendant's coconspirators did not stop him from continuing his illegal dog fighting activity.

In his statement of facts, defendant admitted to possessing, training, and transporting a fighting dog named "Katie aka Champion Asesina" and to conspiring to do so with coconspirator CM in 2017 through 2018. Specifically, after the April 2016 dog fight, defendant and

coconspirator CM continued their dog fighting venture by jointly training, breeding, and fighting Katie, earning her "Champion" fighting status in January 2018.[1]  From May to July 2017, defendant took approximately ten videos of himself training the dog in his backyard and, in some of the videos, referring to the dog as "Katie … grand champion;" in texts to others, he referred to her as "Killer Katie." (See Exhibit A, pages 19-20). Evidence taken from defendant and



coconspirator CM's phones indicate that defendant was training Katie for an upcoming dog fight in 2017. After defendant's training of Katie, coconspirator CM went on to set up several more fights for Katie in 2017 and 2018 with the goal of reaching Grand Champion status. On July 10, 2018, coconspirator CM contacted defendant regarding a recent failed attempt to have her bred to another champion fighting dog stating, "No pups. She back open @ 29." They then discussed setting up a fight for Katie to occur after September 8, 2018, setting a wager of $4,000 and a fighting weight of 29 pounds since "[s]he real fat right now" and he [coconspirator CM] would need time to get her back into shape, according to what he texted defendant. [Bates: DF_CH_SW_0001749].  Defendant discussed this fight setup one day before the search warrant on defendant and coconspirator CM's residences. Agents were unable to find Katie.

---

[1]     Dogfighting has its own separate set of code words, including Champion, which represents a dog's career status after winning three contract matches. Evidence indicated that coconspirator CM's goal was for Katie to win enough dog fights to gain Grand Champion status, after which he would retire her for breeding purposes and to build his yard. Grand Champion status indicates the dog has won five contract matches with no losses. A contract match is a pre-arranged dog fight in which the dog fighters usually establish a wager amount, fighting weights for the dogs, a forfeiture amount, and a future date for the fight that gives the trainers several weeks to rigorously train and condition the dogs. This time period is referred to as a "keep."



After the April 2016 dog fight, defendant also continued his relationship with coconspirator EP, in that defendant bred a dog in September 2017 that was afterwards then in coconspirator EP's possession. Photos taken of the dog (identified as USM 204 by seizing law enforcement agents) in October 2017 in coconspirator EP's backyard show the dog in good condition. However, in June 2018, photos and a video taken of USM 204 in defendant's backyard, sent by defendant to another fighter, show her suffering from some significant injuries, cause unknown, of missing fur and skin from her hind legs. (*See* Exhibit A, pages 10-17). Defendant described her as "my bitch from Manny [coconspirator EP's nickname]." Agents seized USM 204 from defendant's residence on July 11, 2018, with the fur appearing to be growing back in the same areas where the fur and skin were missing in the June 2018 photo. Veterinarians assessed the dog to be fearful, underweight, showing some scars, and requiring multiple extractions due to fractured teeth. The dog was determined to be not dog-aggressive and deemed a candidate for rehabilitation. (See Exhibit A, pages 11-17).

7

Overall, electronic evidence seized from the defendant indicated a time consuming and overwhelming involvement in dog fighting ventures not only with his coconspirators but also with others, throughout the period of the conspiracy. He maintained breeding notes and frequently contacted others involved in dog fighting, including coconspirators EP and CM, and known fighting dog transporters. More importantly, however, the evidence revealed a significant number of videos and photos showing defendant, in his backyard, training dogs, fighting dogs, forcibly breeding restrained dogs, handling puppies, restraining puppies with large, heavy chains, and showing his dog yard.[2]



(See Exhibit A, pages 22-24). Defendant often forwarded these videos and photos to other dog fighters. Many of the photos included those of dogs with old and new scars. The evidence also reveals his numerous and frequent conversations with other dog fighters regarding defendant's breeding attempts, puppies dying, dogs losing weight, dogs he wanted to sell, and dogs he was training. Many of the photos of the dogs he was training, breeding, or wanting to sell, had various degrees of old or healed facial and body scars. Defendant also discussed his medical treatment of dogs in his yard when they got sick.

**B. LEGAL FRAMEWORK**

The Animal Welfare Act makes it unlawful to "knowingly sponsor or exhibit an animal in an animal fighting venture" – *i.e.*, the animal fights themselves. 7 U.S.C. § 2156(a)(1).

---

[2]     Many of these videos showed two dogs, some with weighted collars, in defendant's backyard restrained and at the end of their heavy chains, trying to get at each other, but unable to do so. Other training videos included defendant's voice in the background praising muzzled dogs fighting each other with one of the dogs also tethered to a tire while fighting. This type of fighting is more likely considered strength and endurance training while avoiding any injury for participation in a future show.

Recognizing that it is extremely difficult to detect a dog fight in progress – and not wanting law enforcement to wait until after dogs are maimed and killed in fights to try to disrupt the unlawful enterprise – Congress also criminalized the many predicate activities without which animal fighting would not occur. In particular, it is also unlawful to "knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture." 7 U.S.C. § 2156(b). Each of these violations is punishable by the same maximum penalty – five years in prison. 18 U.S.C. § 49.

## C. BACKGROUND REGARDING DOG FIGHTING

An organized dog fighting venture such as the one in which defendant and his coconspirators were involved bears no resemblance to the territorial quarreling pet dogs might have over food or a toy. It is a form of cruelty to animals – including the extreme forced weight loss and often grueling training involved before a match fight, the untreated injuries sustained inside the fighting ring by both dogs involved, and the not-so-immediate deaths occurring *after* the dog fights from injuries. These dogs do not enjoy the lives of a pet and many of these dogs spend most of their lives in cages or restrained by heavy chains outdoors, and are kept in close distance to other fighting dogs, keeping the anxiety level high. Many dogs are exposed to "roll" or "play" fights in which the dogs are trained to lunge at each other under controlled conditions – sort of a training to test the dogs' aggressiveness or "gameness" to fight. Overall, dog fighting involves taking advantage of pit-bull type dogs' eagerness to please humans, all for gambling purposes, possible financial gain, or a disturbing form of "entertainment."

### D. FEDERAL DOG FIGHTING CASELAW

Congress first enacted the federal animal fighting prohibition in 1976.[3] It was not until approximately twenty-two years later that the statute was actually prosecuted in 1997 and not again until the prosecution of Michael Vick in 2007, in this very division of the Eastern District of Virginia. The Vick case exposed the public to the extreme animal abuse involved in dog fighting, including the animal suffering that occurs before, during, and after dog fights. In particular, the defendants in that case admitted as part of their guilty pleas to having routinely executed underperforming fighting dogs by drowning, hanging, and other brutal means. The following year, Congress increased the penalty from a misdemeanor to a five-year felony and significantly broadened the scope of the offense.[4]

Since 2008, law enforcement has increased its dog fighting prosecutions, but overall, only a few dozen cases have resulted. However, a notable trend emerged of above-Guidelines sentences, based primarily on the cruelty of the offense. Consequently, recognizing that a base offense level of 10 was inadequate, the U.S. Sentencing Commission increased the base offense level to 16 – which is the level it is today [U.S.S.G. § 2E3.1], stating that the increased base offense level "better accounts for the cruelty and violence that is characteristic of these crimes." Sentencing Guidelines for United States Courts, 81 Fed. Reg. 27,262, 27,265 (May 5, 2016).

Many defendants in dog fighting cases filed shortly before or since the increased offense level still received above-guidelines sentences, based either on other crimes involved, or a defendant's extraordinary cruelty to the animals or the defendant's offense involved a fighting

---

[3]      *See* Pub. L. No. 94-279, § 17, Apr. 22, 1976, 90 Stat. 421.
[4]      *See* Pub. L. No. 110-234, Title XIV, § 14207(a), May 22, 2008, 122 Stat. 1461 (initial passage); Pub. L. No. 110-246, § 4(a), Title XIV, § 14207(a), June 18, 2008, 122 Stat. 1664, 2223 (re-enacting entire Farm Bill after enrollment glitch).

venture on an exceptional scale. _See_ Application Note 2 to U.S.S.G. § 2E3.1 (allowing for upward departure). Generally, courts have assessed extraordinary cruelty to be evidence beyond that which is intrinsic in the fighting pit, such as the extreme inhumane killing of dogs outside of the ring (_i.e.,_ – due to losing a fight) or severe neglect of the animals (_i.e.,_ – suffering from untreated dog fight injuries). Likewise, an upward departure based on animal fighting on an exceptional scale involves an offense with an unusually large number of animals. Although not all federal defendants in dog fighting cases have received above-Guidelines sentences, there has been a clear trend among judges in these cases to impose significant Guidelines sentences.[5] In many instances, the above-Guidelines sentences made up for the fact that the Guidelines did not account for the different levels of dog fighters and the varying degree of their involvement in a dog fighting enterprise.

The government submits that an above-Guidelines sentence is not warranted in this case but that a Guidelines sentence would be sufficient to meet the goals of sentencing based on the following analysis.

### E. SENTENCING ANALYSIS

#### 1. The Guidelines Range is 15-21 Months

As stated above, the PSR correctly calculates defendant's total offense level as 13, derived from a base offense level of 16 for the count of conviction. _See_ PSR at ¶¶ 64, 115; U.S.S.G. §§2E3.1(a)(1), 2X1.1. The government agrees with the Probation Office that this calculation is correct given the defendant clearly demonstrated acceptance of responsibility and in a timely manner. Applying a total offense level of 13 to Defendant's criminal history category of II, the PSR correctly derived a final Guidelines range of 15 to 21 months.

---

[5]     _See_ Exhibit B for list of examples of sentencings in various federal dog fighting cases.

## 2. A Guidelines Sentence is Consistent with the Goals of Sentencing Set Forth in 18 U.S.C. §3553(a).

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a):

 (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;"
 (2) the four legitimate purposes of sentencing;
 (3) "the kinds of sentences available;"
 (4) the Guidelines range itself;
 (5) any relevant policy statement by the Sentencing Commission;
 (6) "the need to avoid unwarranted sentence disparities among defendants;" and
 (7) "the need to provide restitution to any victims."

18 U.S.C. § 3553(a)(1)-(7). See also United States v. Hughes, 401 F.3D 540 (4th Cir. 2005).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 (B) to afford adequate deterrence to criminal conduct;
 (C) to protect the public from further crimes of the defendant; and
 (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent a District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (quoting Gall v. United States, 128 S. Ct. 586, 597).

This is a federal dog fighting case in which the defendant knowingly conspired with other dog fighters and engaged in varying activities supporting a dog fighting venture that covered several states. The defendant's criminal conduct involved wagering and the suffering of dogs and continued to promote a cruel and violent form of entertainment and status. The evidence shows

12

that some of these fights were chain weight or "roll" fights and others were dog fights that involved a rigorous several-week training regimen, and usually lasted until one dog died or was near death. We know that defendant provided the location for the April 3, 2016, dog fight and that two dogs died at the end of that event. We also know that defendant continued his dog fighting ventures after this fight with two of the coconspirators.

The evidence further shows that defendant consistently engaged in breeding and training of fighting dogs, as shown by the sheer number of breeding photos and dog fighting videos he took in his backyard, and the countless conversations he had with other fighters about his dog fighting activities.

There are clearly varying levels of dog fighters: some who merely attend a fight here and there when invited; some who are professional handlers and are known as legends in the sport and dedicate all their time and money to their venture; and then there are some, like the defendant, who spend a significant amount of time actively engaged in the dog fighting world, trying to make as much money as they can with training, breeding, and selling dogs involved in dog fighting ventures. The location and size of his backyard allowed him to maintain and space out a significant number of dogs while training and breeding them without interference from neighbors. Essentially, while defendant is not necessarily a ringleader in the sport, his involvement was indeed significant and continuous. In this case, a Guidelines sentence is necessary to meet the ends of Section 3553(a), as described in further detail below.

### (a)      Nature and Circumstances of the Offense

The PSR, Statement of Facts, and overt acts as outlined in the Information, contain numerous examples of defendant's criminal conduct. Defendant's conduct demonstrates that his offenses were intentional and significant. In fact, his criminal conduct did not involve a solitary

violation or participation in a single fight that might be explained as a single instance of bad judgment or a limited scope of misconduct. Rather, the defendant played many roles. As transporter, trainer, and dog fighter, defendant persistently committed offenses over an extended period of time and with full knowledge that he was breaking the laws of the United States.

A dog fighting venture requires significant dedication over time, and defendant and his coconspirators devoted their time and effort toward engaging in this criminal activity. Any sentence should reflect the seriousness of the defendant's extensive involvement.

### (b)    History and Characteristics of the Defendant

As described in more detail above, evidence gathered in this investigation and items seized from the defendant and his coconspirators showed that defendant had been involved in dog fighting since at least 2016, demonstrating that his involvement was not fleeting or casual, but a significant feature of his life for approximately a decade.

As described in the PSR, the defendant graduated from high school, and by his own account, denied any neglect in childhood or any disciplinary problems while growing up. He has been married since 2005 and has two young children with his wife, as well as four children, ages 23 to 24, from prior relationships. See PSR ¶¶ 96-101. Until recently the defendant did not have a steady job or income, but for over a year now, has maintained steady employment along with a reasonable salary. See PSR ¶ 110. That is certainly a step in the right direction.

### (c)    Seriousness of the Offense, Respect for the Law and Just Punishment

Over the last decade, there has been increased public awareness of the serious, violent nature of animal fighting, as reflected by Congress's repeated strengthening of the Animal Welfare Act.[6] The recent amendment of the substantive guideline by the Sentencing

---

[6]    Congress has strengthened the law four times over the last thirteen years, including: the Animal Fighting Prohibition Enforcement Act of 2007, Pub. Law 110–22, 121 Stat. 88, which

Commission, discussed above, further underscores the seriousness of the offense. *See* Sentencing Guidelines for United States Courts, 81 Fed. Reg. at 27,265 ("[t]he Commission [ ] determined that the increased base offense level better accounts for the cruelty and violence that is characteristic of these crimes"). Also, given the extensive, secretive networks that are needed to solicit opponents and to locate, buy and sell dogs of particular coveted bloodlines, dog fighting is organized crime in the traditional sense of that term. The seriousness of this offense weighs in favor of a significant Guidelines sentence.

> **(d)     Need to Afford Adequate Deterrence to Criminal Conduct**

Deterrence comes in two forms: deterring the current defendant from committing additional crimes, and deterrence of future defendants from committing similar crimes. Dog fighting is a highly secretive enterprise that is difficult for law enforcement and investigative professionals to infiltrate. A dog fighting investigation requires many of the same skills and resources employed in major undercover narcotics investigations, thus challenging the resources of any agency that seeks to respond to it.

In defendant's case, evidence shows he had more than the occasional participation in dog fighting ventures. In fact, he continued to engage in most aspects of dog fighting – training, transporting, breeding, and fighting dogs – despite (1) the execution of a search warrant at coconspirator OA's house shortly after the April 2016 dog fight at defendant's relative's house

---

increased animal fighting from a misdemeanor with a one-year statutory maximum to a felony with a three-year statutory maximum; the 2008 Farm Bill, Pub. Law 110–234, Sec. 12407, 122 Stat. 923, which raised the statutory maximum to five years, relaxed the interstate commerce element, and added substantive prohibitions; and the 2014 Farm Bill, Pub. Law 113-79, Sec. 12308, 128 Stat. 649, which made attending animal fights a misdemeanor offense and added a felony offense for bringing anyone 16 years or younger to an animal fight.

and (2) the sentencing of coconspirator MA for his participation in the same dog fight. That requires dedication or a false belief that the law does not apply to the defendant.

Given the limited law enforcement resources available for cases such as this, and the strain it places upon municipal and charitable animal shelters, it is imperative that the sentences imposed in the cases that *are* able to be brought send a strong message of deterrence. Dog fighting tends to involve a private, closely-knit groups of individuals, but nevertheless, many other dog fighters are watching the outcome of this and other federal dog fighting cases in the country. Those who choose to brutalize animals for entertainment, profit, and status must know that their criminal conduct will be severely punished. Consequently, a Guidelines sentence as set in the Guidelines range calculated in the PSR is needed to "afford adequate deterrence to criminal conduct," both to defendant and to other similarly situated potential offenders. 18 U.S.C. § 3553(a)(2)(B).

### (e)    Need to Avoid Unwarranted Sentence Disparities

Defendant's advisory guidelines range in the PSR reflects the facts and circumstances of this case, and his criminal history. The multi-defendant federal dog fighting cases cited in Exhibit B to this memo also provide a reference point in avoiding unwarranted sentencing disparities under 18 U.S.C. 3553(a)(6). Some of those cases cited defendants with varying roles in the conspiracy, and their varying sentences reflected that. Some of the other cases, as in this matter reflect defendants with similar roles and involvement, and their sentences reflected that also. The coconspirators in this case on all accounts were on par with each other as far as their experience and involvement in dog fighting ventures. They all possessed dogs over the years, and they were all involved in breeding, training, and fighting dogs – sometimes the fights were significant events, and others were roll fights or fights testing the dogs' "gameness" or

willingness to fight. They all had similar training equipment and medical kits; they often shared the same transporters, and they often interacted with some of the same people in dog fighting.

At this time, only one of defendant's coconspirators has been sentenced and that is coconspirator MA from New Jersey who fought his dog and lost against coconspirator OA in the April 3, 2016, dog fight. (Coconspirator CM is scheduled to be sentenced before defendant). On June 15, 2017, coconspirator MA plead guilty to sponsoring a dog in the April 2016 fight, as well as for possession of 18 dogs for purposes of participation in an animal fighting venture. He was initially charged in a complaint with a dog fighting conspiracy beginning in 2015 and ending in 2016, which involved eight other defendants. He was the first defendant to plead guilty to an information charging him with sponsoring a dog in the April 2016 dog fight and with possession of 18 dogs for dog fighting purposes. Coconspirator MA was sentenced, under the pre-2016 guidelines with a Guidelines range of 6-12 months, to a term of 24 months of imprisonment on each of the counts, to be served concurrently, and a $1,000 fine. See Transcript of Sentencing at 67-68, United States v. Atkinson, No. 3:17-CR-222-PGS-1, (D.N.J. Apr. 18, 2018) (Using pre-2016 Guidelines; varying upwards by 12 months because "[t]here needs to be a longer period of imprisonment. We need to give a message to society that anyone that's involved in dog fighting is going to be subject to greater penalties than this, because the activity itself is depraved – it's just a very depraved activity; it's horrific and it's upsetting to everybody to see that our animal friends would be treated in such a manner"). To avoid a sentencing disparity with the defendant's coconspirators and to accurately reflect the comparative length and significance of the defendant's involvement in dogfighting, a Guidelines sentence for the defendant is merited.

### 3.     Special Conditions of Supervised Release

The Court should also include the special condition of supervised release recommended in the PSR. See PSR ¶ 5. The condition that Defendant be prohibited from possessing or owning any pit-bull type dogs or any breeds of dogs he intends to breed and/or sell, either personally or through a third party is commonly imposed in dog fighting cases, and is appropriate given the nature of the offense.[7]

### F.  CONCLUSION

Considering all of the 18 U.S.C. § 3553 sentencing factors, including the defendant's acceptance of responsibility and the relevant Guidelines provisions and case law discussed above, a Guidelines sentence as calculated in the PSR would be sufficient but not greater than necessary to fulfill the purposes of sentencing. The Court should also impose a term of three years of supervised release in this case. Given Defendant's long-running participation in dog

---

[7]     See, e.g., United States v. Andrews, 7:16-cr-122, ECF No. 358 (Judgment) at 6 (E.D.N.C., Dec. 22, 2017); United States v. Love, 3:17-cr-51, ECF No. 295 (Judgment) at 3 (D.N.J. July 8, 2019).

fighting, the maximum term of supervised release – three years – is appropriate, to help ensure

that he does not return to the unlawful activity that played a prominent role in his life.  18 U.S.C.

§ 3583(b)(2).

Respectfully submitted,

| RAJ PAREKH<br>ACTING UNITED STATES ATTORNEY<br><br><br>_____/s/_____<br>Olivia L. Norman<br>Assistant United States Attorney<br>V.S.B. No. 31418<br>Office of the United States Attorney<br>919 E. Main Street, Suite 1900<br>Richmond, Virginia 23219<br>(804) 819-5475<br>(804) 771-2316 (facsimile)<br>Olivia.Emerson@usdoj.gov | TODD KIM<br>ASSISTANT ATTORNEY GENERAL<br><br><br>_____/s/_____<br>Shennie Patel<br>Trial Attorney, Environmental Crimes<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>150 M Street NE, Suite 4.111<br>Washington, D.C. 20002<br>(202) 305-0295<br>(202) 514-8865 (facsimile)<br>Shennie.Patel@usdoj.gov |
| --- | --- |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of August, 2021, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the counsel of record.

By: _____/s/_____
SHENNIE PATEL
Trial Attorney, Environmental Crimes Section
Environment and Natural Resources Division
U.S. Department of Justice
150 M Street NE, Suite 4.111
Washington, D.C. 20002
(202) 305-0295
(202) 514-8865 (facsimile)
Shennie.Patel@usdoj.gov